JOURNAL ENTRY and OPINION
{¶ 1} Appellant Charles R. Crable appeals the trial court's decision granting summary judgment in favor of appellees Nestle USA, Inc., Nestle Prepared Food Company ("NPFC"), Joe Weller (CEO and President of Nestle, USA), Jay Weaver (Vice President of Operations at NPFC), Curt Norpell (plant manager), Reginald Stover (Manager of Human Resources), Jacquie Folk (Manager of Human Resources), and James Bennett (Shift Manager). (Hereinafter referred to collectively as "Nestle"). Crable assigns the following two errors for our review:
"I. Whether the trial court erred in finding plaintiff has notproved with evidence that his claims for discrimination,negligent supervision and retaliation took place in thisworkplace and plaintiff has not met his burdon [sic] of provingthe elements involved in these intentional torts."
 "II. Whether the trial court erred or abused its discretion indetermining no material issues of fact existed to prohibit thegranting of defendants'-appellees' motions for summary judgmentwhich was adverse to the plaintiff who opposed the motions."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the decision of the trial court. The apposite facts follow.
 {¶ 3} Nestle hired Crable on September 24, 1998 as an ingredient handler and promoted him to check weigher and then to weight control operator. On August 19, 2004, Crable resigned.
 {¶ 4} On June 1999, Crable filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") against Nestle. Six months later, Crable filed a lawsuit in federal court against Nestle and its president, Joe Weller. The federal district court granted summary judgment in favor of Nestle on September 21, 2000, finding Crable had presented no evidence that any actions taken against him were motivated by his race. The Sixth Circuit affirmed the decision on appeal.
 {¶ 5} After the lawsuit, Crable continued to receive satisfactory performance reviews, promotions, and regular pay raises. Eventually, Crable filed a pro se complaint on November 9, 2004 asserting the following five claims against the appellees: race, sex, and age discrimination, negligent supervision, intentional infliction of emotional distress, and retaliation. The claims arose out of following ten instances:
 {¶ 6} (1) Crable contends that in May 2002, Steven Barnes berated him in front of co-workers while he was training for the position of check weigher. According to Crable, Barnes informed co-workers he was not going to approve Crable's application to become a check weigher because he was not doing the job well. Crable complained to Barnes' supervisor that he was not being trained properly. Crable admits that the problem was resolved to his satisfaction. He received the promotion to the position of check weigher.
 {¶ 7} (2) Crable contends that Barnes berated him for not preparing his station for a wash-down. Crable informed Barnes that the wash-down notice was not posted. Barnes did not initiate corrective action against Crable after verifying that it was not posted.
 {¶ 8} (3) Crable contends that in September 2003, Lee Morrison and James Bennett (who is an African-American), informed him his product weight levels were too low and to adjust them accordingly. He was threatened with corrective action, which was later reduced to a nonperformance entry. Crable disputed the violation by providing documentation that he was following the training he received in statistical process control ("SPC") technology. Crable wrote a letter to Morrison's supervisor, Ronald Spears, informing him that Morrison instructed him to use different levels other than the SPC levels. Thereafter, Morrison informed Crable to continue to use the SPC weight levels. No disciplinary action was taken against Crable.
 {¶ 9} (4) Crable contends in September 2003, two white female weight control operators were assigned to become weight control trainers. Crable believed he was more qualified than these females, but conceded he did not know what the qualifications for trainer were. The trainer obligations did not constitute a separate position from the weight control position, because training was only done when the weight control job allowed time. There was also no evidence the training responsibilities resulted in an increase in pay.
 {¶ 10} (5) Crable was told by another Nestle employee that co-worker Dawn Salata said she would have "written up" Crable for using the wrong day code on a product. Crable acknowledges that running a wrong day code would have violated company policy. He contends, however, it was not his fault that a wrong day code was run on the day in question. Crable was not disciplined for running the wrong day code.
 {¶ 11} (6) On November 21, 2003, Crable contends James Bennett threatened him with corrective action for not reporting a quality control violation. Crable disputed the allegation. Reginald Stover of Human Resources agreed Crable should not have been written up and removed the performance report from his file.
 {¶ 12} (7) On February 10, 2004, Crable's weight control job was consolidated with the position of tray dropper. Crable complained to Reginald Stover and James Bennett about the consolidation of these positions, contending it was too hard to perform both positions. As a result of his complaint, modifications were made to the consolidation so that Crable would receive assistance when he was filling a meal with more than one component. All the positions on production line five were subject to the consolidation, not just Crable.
 {¶ 13} (8) In July 2004, Bennett reprimanded Crable for starting his production line late. Crable complained to supervisors, and they determined that the Crable and Bennett had a miscommunication as to when to start the line. No disciplinary action was taken.
 {¶ 14} (9) In August 2004, Crable was informed by Bennett that he would no longer receive assistance with dropping trays unless he was filling a meal with more than two components. When Crable complained about the difficulty of the process, Bennett advised him to fill 60% of the trays. The following day Crable resigned.
 {¶ 15} (10) On August 19, 2004 Crable discovered he was scheduled to work on Saturday, August 21, 2004. The company policy was that all employees had to work at least one Saturday a month. However, if the employee's back-up agreed to work in the employee's place, the employee did not have to work on that Saturday. Crable contends his back-up had agreed to work in his place, yet the back-up was not scheduled. This incident occurred before Crable resigned.
 {¶ 16} Crable contends he received the above treatment because he was a sixty-four-year-old African-American male. He also argues the supervisors retaliated against him for helping a co-worker write letters to management about an alleged harassment of that employee.
 {¶ 17} The appellees filed motions for summary judgment, which Crable opposed. The trial court granted summary judgment in favor of the appellees' finding:
"When viewing all the facts in the light most favorable toplaintiff the evidence supports granting all motions for summaryjudgment. Plaintiff has not proved with evidence that his claimsfor discrimination, negligent supervision and retaliation tookplace in this workplace.
 Plaintiff has not met his burden of proving the elementsinvolved in these intentional torts. When viewing the evidence inplaintiff's favor, reasonable minds could come to only oneconclusion that these motions for summary judgment aregranted."[1]
 Standard of Review {¶ 18} Crable argues in his assigned errors that the trial court erred by granting summary judgment in favor of Nestle. We disagree.
 {¶ 19} We review an appeal from summary judgment under a de novo standard of review.[2] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[3] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion which is adverse to the non-moving party.[4]
 {¶ 20} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[5] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact.[6]
 Discrimination {¶ 21} R.C. 4112.02(A) provides:
 {¶ 22} "It shall be an unlawful discriminatory practice:
"For any employer, because of the race, color, religion, sex,national origin, handicap, age, or ancestry of any person, todischarge without just cause, to refuse to hire, or otherwise todiscriminate against that person with respect to hire, tenure,terms, conditions, or privileges of employment, or any matterdirectly or indirectly related to employment."
 {¶ 23} R.C. Chapter 4112, is Ohio's counterpart to Section 2000e, Title 42, U.S. Code ("Title VII"). Therefore, federal case law interpreting Title VII is generally applicable to cases brought under Chapter 4112.[7] An employee alleging discrimination can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using theMcDonnell Douglas framework set forth below, by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying the adverse employment action.[8] Direct evidence "is that evidence which, if believed, requires the conclusion that the unlawful discrimination was at least a motivating factor in the employer's actions."[9] Crable admitted in his deposition that he has no direct evidence that he was discriminated against.
 {¶ 24} Where the plaintiff has only circumstantial evidence of a discriminatory motive, claims are analyzed under the framework set forth in McDonnell Douglas Corp. v.Green.[10] In McDonnell Douglas Corp.,[11] the United States Supreme Court established a flexible formula to ferret out impermissible discrimination.
 {¶ 25} A prima facie case of discrimination under theMcDonnell Douglas framework requires a plaintiff to establish that he or she: (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position either lost or not gained, and (4) that the position remained open or was filled by a person not of the protected class.[12]
 {¶ 26} A plaintiff can also make out a prima facie disparate treatment case by showing, in addition to the first three elements, that the employee was "treated differently than a similarly-situated employee from outside the protected class."[13] To be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct.[14]
 {¶ 27} The establishment of a prima facie case of discrimination under McDonnell Douglas creates a rebuttable presumption that the employer unlawfully discriminated against the employee.[15]
 {¶ 28} Crable is a sixty-four year old African-American male. Consequently, Crable is a member of a protected sex, age, and racial class. Additionally, the parties do not dispute that Crable was qualified for his position. Therefore, Crable met his burden as to the first and third elements of a discrimination claim.
 {¶ 29} Our review of the record indicates, however, that Crable has failed to prove the second and fourth elements of a prima facie case. That is, he produced no evidence that he was subjected to an adverse employment action or that similarly-situated employees outside his protected classes were treated more favorably.
 {¶ 30} Although he was upset about his job consolidation, he admitted that of all the workers on production line five were affected by the consolidation, not just him. Therefore, he was not being treated dissimilarly. Furthermore, when he originally complained about the job consolidation, modifications were made to the position to accommodate him. When the position was again modified by reducing the help Crable required on some of the less complex meals, Crable never informed his supervisor that he was not able to meet his production quotas under the new modification. Instead, he resigned.
 {¶ 31} He also claims he was denied the opportunity to be a trainer, and that the trainer position was instead offered to two female co-workers. However, the training involved did not constitute a separate position. Rather, the training only occurred on an as needed basis and when the weight control position allowed the time. Moreover, there was no evidence that the trainers received an increase in salary. Crable also admitted he never expressed an interest in the position and was not aware of what qualifications were necessary for training. Therefore, there is no evidence he was, in fact, qualified for the position.
 {¶ 32} There is also no evidence that Crable suffered an adverse employment action. Unless an employment action involves a significant detriment, it is not materially adverse and thus, not actionable. The Sixth Circuit has defined "adverse employment action" to include such things as: "termination of employment, a demotion as evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or indices that might be unique to a particular situation."[16] Not every action that makes an employee unhappy or resentful is an adverse employment action.[17]
 {¶ 33} In the instant case, Crable contends he was constructively discharged. However, in order to prove constructive discharge, the plaintiff must prove the employer's actions made the plaintiff's working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.[18]
 {¶ 34} Crable quit because he was unhappy that he had to perform the duties of both weighing meals and dropping trays on meals with two or less components. He complained to Bennett that it was difficult and was instructed to attempt to fill 60% of the trays. After one day, Crable felt he could not perform the consolidated job without help. However, instead of informing Bennett, he resigned. In light of management's previous willingness to accommodate Crable's concerns about the job consolidation, his resignation was unreasonable.
 {¶ 35} He also contends he was upset by the fact he was scheduled to work on a Saturday when his back-up had already requested to work that Saturday for him. But again, he never told anyone he was upset about this scheduling. Instead, he submitted his letter of resignation on the Saturday he was scheduled to work.
 {¶ 36} Although Crable alleges various employment disagreements occurred, none of them resulted in a significant detriment to Crable. In fact, Crable admitted in his deposition that once the disagreements were brought to management's attention, they were resolved to his satisfaction. Therefore, based on the evidence before us, there is no evidence that Crable was subjected to an adverse employment action.
 {¶ 37} We conclude the trial court did not err by granting summary judgment in favor of Nestle on Crable's discrimination claims based on his lack of evidence in support of these claims.
 Negligent Supervision {¶ 38} Crable also contends he was subjected to negligent supervision. Crable argues that President Joe Weller and Vice President of Operations Jay Weaver should have prevented the harassment that occurred. He also argues that Jacquie Folk and Reginald Stover of Human Resources failed to update the job description and essential functions of the weight control position, thereby, allowing it to be consolidated with the tray-dropping job in violation of company policy.
 {¶ 39} The elements of negligent supervision are: 1) an employment relationship, 2) incompetence of the employee, 3) actual or constructive knowledge of the incompetence by the employer, 4) an act or omission by the employee which caused the plaintiff's injuries, and 5) negligent retention of the employee by the employer, which action is the proximate cause of the plaintiff's injuries.[19]
 {¶ 40} There is no evidence that Weller and Weaver had any notice of Crable's alleged harassment. The evidence indicates that matters Crable alleged were harassment were resolved satisfactorily. Therefore, officers in the company would have no reason to believe the harassment was not resolved.
 {¶ 41} Although Crable argues Bennett's requiring him to perform the tray dropping job along with the weight control position without help was a form of harassment, he quit without informing Bennett it was too difficult to perform the job without help. He also failed to complain to management about being scheduled to work on the Saturday for which his back-up had already volunteered. Therefore, management would not have known of these allegations of harassment.
 {¶ 42} We also find no merit to Crable's contention that his job consolidation was a product of negligent supervision. He argues the consolidation was authorized without a current job description and job essentials accurately depicting his duties in violation of company policy. There is no evidence beyond Crable's mere statement that the job would not have been consolidated if the new job description and job essentials were timely issued. Therefore, the Human Resource employees' delay in distributing the revised handbook did not result in injury to Crable. Thus, there is no evidence in support of the fourth and fifth element of a negligent supervision claim.
 {¶ 43} We conclude the trial court did not err in granting summary judgment on Crable's negligent supervision claim because he failed to provide evidence that Joe Weller and Jay Weaver were aware of the alleged harassment and because there is no evidence any alleged negligent supervision resulted in injury to Crable.
 Retaliation {¶ 44} In order to establish a prima facie case of retaliation, Crable must establish three elements: (1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action.[20]
 {¶ 45} Once an employee successfully establishes a prima facie case, it is the employer's burden to articulate a legitimate reason for its action.[21] If the employer meets its burden, the burden shifts back to the employee to show that the articulated reason was a pretext.[22]
 {¶ 46} In the instant case, Crable contends he was retaliated against for helping a co-worker write letters to management regarding harassment. However, there is no evidence that Nestle management knew Crable was writing the letters on behalf of his co-worker. Although Jacquie Folk in Human Resources stated in her deposition that she found out Crable was helping his co-worker, she never stated when she made the discovery; therefore, there is no causal connection between her knowledge and the alleged harassment.
 {¶ 47} Crable contends he was also retaliated against for bringing his prior federal lawsuit against Nestle. However, the lawsuit was too remote in time. Crable brought his federal lawsuit in 1999. The actions Crable challenges did not begin to occur until May 2002, three years after filing his suit, to August 2004, nearly five years afterwards. When the challenged action is remote in time from the protected activity, no inference of retaliation arises.[23]
 {¶ 48} There was also no evidence that Crable was subjected to an adverse employment action. As we stated above, examples of a materially adverse employment actions are "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities * * *."[24] To constitute a materially adverse employment action, a change in work conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."[25]
 {¶ 49} Although Crable's position was altered by the consolidation of his position with another position, management accommodated him when the consolidation first occurred. There is no evidence management would not have accommodated him again when the position was again modified. Moreover, Crable admitted the consolidation effected everyone on production line five, not just him.
 {¶ 50} Crable also contended he suffered from retaliatory harassment. With regard to proving "severe or pervasive retaliatory harassment," we note that employment actions that are de minims are not actionable.[26] "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure."[27] In the instant case, it is clear that Crable was unhappy with some of the reprimands he received by supervisors. However, every time he complained about the alleged harassing behavior, management resolved the problem to Crable's satisfaction. He received pay raises and promotions, and no negative performance entries were made on his record.
 {¶ 51} We conclude the trial court properly granted summary judgment in favor of Nestle on Crable's claims of discrimination, negligent supervision, and retaliation. Accordingly, Crable's first assigned error is overruled.
 Intentional Infliction of Emotional Distress {¶ 52} In his second assigned error, Crable contends the trial court erred in granting summary judgment on his claim of intentional infliction of emotional distress.
 {¶ 53} The Supreme Court of Ohio has defined the tort of intentional infliction of emotional distress as:
"One who by extreme and outrageous conduct intentionally orrecklessly causes serious emotional distress to another issubject to liability for such emotional distress, and if bodilyharm to the other results from it, for such bodilyharm."[28]
 {¶ 54} To establish a claim for intentional infliction of emotional distress, the plaintiff must prove: (1) that the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress, (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized community, (3) that the defendant's actions were the proximate cause of plaintiff's psychic injury, and (4) that the mental distress suffered by plaintiff is serious and of such a nature that no reasonable person could be expected to endure it.[29]
 {¶ 55} Liability for intentional infliction of emotional distress will only be found in the most extreme circumstances:
"Liability has been found only where the conduct has been sooutrageous in character, and so extreme in degree, as to gobeyond all possible bounds of decency, and to be regarded asatrocious, and utterly intolerable in a civilized community.Generally, the case is one in which the recitation of the factsto an average member of the community would arouse his resentmentagainst the actor, and lead him to exclaim,`Outrageous!'"[30]
 {¶ 56} The Supreme Court of Ohio has also made clear that "in order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious."[31] In Paugh v. Hanks,[32] the Supreme Court of Ohio described "serious emotional distress" as "emotional injury which is both severe and debilitating." ThePaugh Court held that "serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."[33] The Court then set forth some examples of serious emotional distress: "A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia."[34]
 {¶ 57} We conclude the actions challenged by Crable did not constitute "outrageous conduct." Crable admitted his complaints about harassment were satisfactorily resolved by management. He received promotions and pay raises, and no negative reports were placed on his record. We cannot conclude based on this record that Crable was subjected to outrageous behavior.
 {¶ 58} Moreover, there is no evidence that Crable suffered a "severe and debilitating" emotional injury. Summary judgment is appropriate when the plaintiff presents no testimony from experts or third parties as to the emotional distress suffered and where the plaintiff does not seek medical or psychological treatment for the alleged injuries.[35] Crable presented no evidence from an expert or third party as to the emotional distress he suffered, and failed to seek professional treatment for any alleged emotional distress. The only emotional injury mentioned by Crable was an episode of ulcerative colitis he suffered in November 2002. However, he has suffered from this condition for over 35 years.
 {¶ 59} Without evidence of an emotional injury, let alone, a "severe and debilitating" one, we cannot conclude the trial court erred by granting summary judgment on Crable's intentional emotional distress claim. Accordingly, Crable's second assigned error is overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
James J. Sweeney, P.J., and Christine T. McMonagle, J.,concur.
[1] Journal Entry, July 14, 2005.
[2] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddyv. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35; NortheastOhio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs. (1997),121 Ohio App.3d 188.
[3] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[4] Temple v. Wean United, Inc. (1997), 50 Ohio St.2d 317,327.
[5] Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.
[6] Id. at 293.
[7] See, Genaro v. Cent. Transport, Inc. (1999),84 Ohio St.3d 293, 295, 1999-Ohio-352; Plumbers Steamfitters Commt. v.Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192, 196.
[8] See Kline v. Tennessee Valley Authority (6th Cir. 1997),128 F.3d 337, 348; Ercegovich v. Goodyear Tire Rubber Co.
(6th Cir. 1998), 154 F.3d 344, 350.
[9] Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.
(6th Cir. 1999), 176 F.3d 921, 926.
[10] (1973), 411 U.S. 792, 36 L.Ed.2d 668, 93 S.Ct. 1817.
[11] (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.
[12] Id.
[13] Policastro v. Northwest Airlines, Inc. (C.A.6, 2002),297 F.3d 535, 538, citing Mitchell v. Toledo Hosp. (C.A.6, 1992), 964 F.2d 577, 582-583.
[14] Mitchell, supra, at 582-583; Kanieski v. Sears, Roebuck Co., Cuyahoga App. No. 80833, 2003-Ohio-421.
[15] Texas Dep't of Community Affairs v. Burdine (1981),450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207.
[16] Hollins v. Atlantic Co. (C.A. 6, 1999), 188 F.3d 652,662, citing Kocsis v. Multi-Care Management, Inc. (C.A. 6, 1996), 97 F.3d 876, 886.
[17] Primes v. Reno (C.A. 6, 1991), 190 F.3d 765, 767.
[18] Minter v. Cuyahoga Community College (Feb. 27, 2000), Cuyahoga App. No. 76700; Zimmerman v. Eagle Mtge. Corp. (1996),110 Ohio App.3d 762, 782; Risch v. Friendly's Ice Cream Corp.
(1999), 136 Ohio App.3d 109.
[19] Payton v. Receivables Outsourcing, Inc.,163 Ohio App.3d 722; 2005-Ohio-4978; Steppe v. Kmart (1999),136 Ohio App.3d 454, 465; Evans v. Ohio State Univ. (1996),112 Ohio App.3d 724, 739.
[20] Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, 727; Morris v. Oldham County Fiscal Court (6th Cir. 2000), 201 F.3d 784; Rice v. Cuyahoga County DOJ, Cuyahoga App. No. 85576, 2005-Ohio-5337.
[21] Id.
[22] Id.
[23] Hall v. Banc One Mgmt. Corp., 10th Dist. No. 04AP-905, 2006-Ohio-913; Brubaker-Schaub v. The Geon Co., Cuyahoga App. No. 75694, 2001-Ohio-4118.
[24] Kocsis v. Multi-Care Management, Inc. (6th Cir. 1996),97 F.3d 876, 885.
[25] Id. at 886.
[26] Bowman v. Shawnee State Univ. (6th Cir. 2000),220 F.3d 456, 462.
[27] Primes v. Reno (6th Cir. 1999), 190 F.3d 765, 767.
[28] Yeager v. Local Union 20, Teamsters, Chauffeurs,Warehousemen Helpers of Am. (1983), 6 Ohio St.3d 369, syllabus.
[29] Pyle v. Pyle (1983), 11 Ohio App.3d 31, 34. See, also,Phung v. Waste Mgt., Inc., 71 Ohio St.3d 408, 410, 1994-Ohio-389.
[30] Yeager v. Local Union 20, supra.
[31] Id.
[32] (1983), 6 Ohio St.3d 72, 78.
[33] Id.
[34] Id.
[35] Buckman-Peirson v. Brannon (2004), 159 Ohio App.3d 12;Plikerd v. Mongeluzzo (1992), 73 Ohio App.3d 115; Sheets v.Rockwell Internatl. Corp. (1990), 68 Ohio App.3d 345.