[Cite as *Bostick v. Salvation Army*, 2023-Ohio-933.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

OLATOSHIA BOSTICK,                    :

    Plaintiff-Appellant,          :

                              No. 111916

    v.                            :

SALVATION ARMY, ET AL.,               :

    Defendants-Appellees.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 23, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-945904

---

### *Appearances:*

Spitz, The Employee's Firm, Kevin A. Buryanek, and
Christopher P. Wido, *for appellant*.

Cavitch, Familo & Durkin Co., L.P.A., Douglas A. DiPalma,
and Jacob W. Doerr, *for appellees*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Plaintiff-appellant Olatoshia Bostick ("Bostick") appeals the trial court's

August 8, 2022 decision granting summary judgment in favor of defendants-

appellees the Salvation Army and Michelle Grabowski ("Grabowski"). After a thorough review of the facts and pertinent law, we affirm.

**Procedural History**

{¶ 2}    In April 2021, Bostick initiated this action against her former employer, the Salvation Army, and her former supervisor at the Salvation Army, Grabowski. Bostick sought relief based on three claims: (1) race discrimination, which she alleged against both defendants; (2) unlawful retaliation, which she alleged against both defendants; and (3) wrongful termination in violation of public policy, which she alleged solely against the Salvation Army.

{¶ 3}    The Salvation Army and Grabowski filed a joint answer in which they denied the substantive allegations of Bostick's complaint.

{¶ 4}    The parties engaged in discovery and, after its completion, the Salvation Army filed a motion for summary judgment, and Grabowski filed a separate motion for summary judgment. Bostick opposed the motions, and the defendants filed a joint reply.

{¶ 5}    The trial court granted both motions for summary judgment and this appeal followed.

**Factual Background Adduced during Discovery**

{¶ 6}    Bostick, an African-American female, worked for the Salvation Army for 11 months. The Salvation Army hired Bostick in April 2019 and terminated her employment in March 2020.

{¶ 7} At all relevant times, the Salvation Army used an online job application process whereby applicants initially applied online. In early April 2019, Bostick applied online for a program aide position in the "survivors' respite program" ("survivors' program"). Program aides were required, among other things, to: (1) maintain confidentiality; (2) be a role model for appropriate demeanor; (3) intervene in and deescalate potentially volatile situations and/or notify security; (4) maintain peaceful and cooperative relationships with clients and coworkers; (5) display pro-social behavior; and (6) maintain appropriate boundaries with clients and employees.

{¶ 8} After submitting her online application, Bostick interviewed with Grabowski and completed a handwritten application. During the application process, Bostick stated that she had a high school diploma, was a state tested nurse's assistant, and was a phlebotomist. After Bostick's meeting with Grabowski, Bostick was hired and began her employment at the Salvation Army in late April 2019.

{¶ 9} Bostick worked at the Salvation Army's Harbor Light Complex in Cleveland. Harbor Light operates programs that help the marginalized individuals achieve self-sufficiency. One of the programs operated at Harbor Light is the Zelma George Family Shelter (the "shelter"). The shelter has housing for up to 35 families and had housing for victims of human trafficking. In addition to the services offered at the shelter for victims of human trafficking, the survivors' program, which Grabowski supervised and in which Bostick worked, was also operated at Harbor

Light, and provided survivors of human trafficking a place and support to help them recover.

{¶ 10} The record demonstrates that Bostick was involved in numerous negative incidents while working at the Salvation Army. The defendants focused on the following incidents, as well as Bostick's sole performance review, in support of their motions for summary judgment.

**August 19, 2019 Incident with Audrey Silver**

{¶ 11} Audrey Silver is an African-American female who worked as a case worker in the corrections program at Harbor Light. The record demonstrates that Silver and Bostick bumped into each other — it is not clear who was at fault — and the two exchanged words.

{¶ 12} On August 19, 2019, Silver sent an email to her and Bostick's supervisors stating that Bostick was talking negatively about her. Silver's email prompted Grabowski to send an email to Harbor Light human resources director, Michelle White, informing her of the situation between Silver and Bostick. In the email, Grabowski informed White that she (Grabowski) had met with Bostick three times on August 19 to discuss the complaints Silver made against Bostick. Bostick admitted that she had had confrontations with Silver, but blamed Silver. Grabowski further informed White that she, supervisors from the corrections program, Silver, and Bostick had arranged a meeting.

{¶ 13} The meeting occurred a few days later. The supervisors informed Bostick and Silver about expectations for work-time behavior. Bostick and Silver

appeared to understand and indicated that they would move past this incident. Unbeknownst to the attendees, Bostick recorded the meeting.[1]

### August 30, 2019 Performance Review

{¶ 14}     Bostick had one performance review from her employment with the Salvation Army; the review was conducted after her 90-day probationary period. The review noted that Bostick had difficulty getting along with coworkers and suggested that Bostick should (1) display a calmer demeanor; (2) avoid conflict; (3) work to deescalate situations with coworkers; and (4) be mindful of proper boundaries.  Bostick signed the review without making any comments.

### September 2, 2019 Incident with Krystal Wentz

{¶ 15}     Krystal Wentz is an African-American female who worked at Harbor Light as a residential monitor in the corrections program.  Bostick learned that Wentz had allowed a client to bring outside food into Harbor Light, a violation of the policies of the survivors' program.  Wentz apparently learned of Bostick's concern and, according to Bostick, thereafter made a disparaging comment about Bostick. Bostick learned of the comment, confronted Wentz, and an argument between the two women ensued.

{¶ 16}     Thereafter, Bostick filed a complaint against Wentz with a supervisor in the corrections program.  A meeting with Wentz, Bostick, a corrections

---

[1] As will be mentioned in this opinion, this was not the only meeting Bostick secretly recorded.  The Salvation Army learned of the recordings during the discovery conducted in this action.  The recordings were in violation of the Salvation Army policies.

supervisor, and Grabowski was held.  According to Bostick, after that meeting, she never talked to Wentz again.

### November 5, 2019 Incident with Jennifer Tresatti

{¶ 17}     In late September 2019, Jennifer Tresatti, a Caucasian female, who had been working in the survivors' program with Bostick, began working as a case manager at the shelter.  Tresatti had applied for the job at the shelter and was selected.

{¶ 18}     In early October 2019, Grabowski informed Bostick that Tresatti was leaving the survivors' program to start her new position at the shelter, and that Bostick would now be moved from first shift to second shift.  Bostick objected to the shift change.

{¶ 19}     On November 5, there was an incident involving Tresatti, Bostick, and an employee at the shelter, Miaikie Winfield, an African-American female.  Bostick and Winfield were on a phone call during which Winfield was heard referring to Tresatti as a "white b****"; Winfield was speaking loudly at the time the comment was made.

{¶ 20}     As part of an investigation into the incident, seven written statements were obtained.  Three of the statements were from the shelter employees, three were from clients in the shelter, and the final statement was from Bostick.  Bostick was the only witness of the seven who denied Winfield referred to Tresatti in a derogatory manner.  The other six witnesses described Winfield as referring to

Tresatti as either a "white b****," a "white racist b****," or a "racist." As a result of the investigation, Winfield was terminated two days after the incident.

{¶ 21}     After Winfield's termination, Bostick filed complaints about Tresatti. The complaints alleged that Tresatti was (1) having a sexual relationship with a client; and (2) telling clients that Bostick was angry because Tresatti got the job at the shelter.

### December 30, 2019 Incident with Tresatti; Subsequent Written Warning and Three-Day Suspension

{¶ 22}     On December 30, Ashlee Roe, an African-American employee at the Salvation Army, overheard Bostick telling clients that Tresatti was a "crackhead" who should not be allowed to work with children. According to Roe, Bostick made the comment while at the front desk of the shelter at 4:45 p.m. Roe reported the incident to her supervisor. A few days later, Roe submitted a written complaint about the incident.

{¶ 23}     The day following the incident, Roe's supervisor reported it to Bostick's supervisor, Grabowski. Grabowski then reported it via email to White, Harbor Light's human resources director. In the email, Grabowski also summarized the previously mentioned incidents herein, as well as an incident from July 2019, where Bostick was outside the shelter talking with residents for approximately 45 minutes when she was the only program aide on duty.

{¶ 24}     Several days after the December 30 incident, in early January 2020, White and Grabowski met with Bostick to discuss the incident. Bostick again

secretly recorded the meeting. According to the recording, when Bostick was questioned about the December 30 incident, Bostick denied that she was at the shelter at 4:45 p.m. Grabowski and White left the meeting to view security footage of the shelter lobby, which showed Bostick there at 4:45 p.m. The two then informed Bostick what the security footage showed. Bostick then admitted to being there but denied making disparaging remarks about Tresatti. Bostick was given a written warning and a three-day suspension without pay. According to White, she did not find Bostick's denial about disparaging Tresatti credible.

{¶ 25} The written warning noted that Bostick repeatedly failed to get along with her coworkers and that, despite prior meetings between Bostick and Grabowski, coworkers were still lodging complaints about Bostick. The warning advised Bostick that "immediate improvement is expected" and "future infractions will lead to progressive disciplinary action up to and including termination." Bostick signed the warning without making any written comment.

**February 20, 2020 Incident with Grabowski**

{¶ 26} On the evening of February 20, Bostick was working with two other program aides, one of whom, Jennifer Kovell, was a recent hire who had only been working in the survivors' program for approximately two weeks. The record demonstrates that a client violated the program rules by bringing food into her room and became confrontational with the staff when informed of the infraction. Security was called and as the client was being removed from the premises, she reportedly made a threat against Bostick.

{¶ 27}    The following day, Bostick learned of the threat and texted Grabowski several messages about it.  In her text, Bostick stated that she did not take threats lightly, demanded that the client be removed from the survivors' program, and complained about the management of the program.  Bostick also threatened that she would retain a lawyer.

{¶ 28}    Concerned about the incident, Grabowski set up a meeting with White (Harbor Light's human resources director) and Bostick.  Bostick recorded certain portions of the meeting.  White and Grabowski informed Bostick that the client involved in the incident would not be allowed to return to the survivors' program.  Bostick apologized for the text messages she sent to Grabowski and promised that if she had further issues, she would call, and not text, Grabowski.  After the meeting, White sent an email to Grabowski recapping what was discussed at the meeting.

### Final Incident:  March 2020 with Kovell

{¶ 29}    Bostick's final incident that occurred while she was employed at the Salvation Army began on March 12, 2020.  On that day, Kovell, a then relatively new hire, complained to Grabowski about Bostick's "unprofessional and rude behavior."  Grabowski asked Kovell to put her complaint in writing.  On March 13, Kovell submitted five written complaints about Bostick to Grabowski.  The complaints were that Bostick:  (1) allowed clients to order food from outside of Harbor Light and bring it onto the third floor in violation of program rules; (2) made "very negative comments" about the food being served to the clients at Harbor Light; (3) spent too

much time Skyping with her son and not working; (4) used "foul language frequently" in front of clients; and (5) loudly and profanely bragged about "beating up" people.

{¶ 30} On March 17, Grabowski informed Bostick about Kovell's five complaints. That same day, Bostick then submitted five written complaints about Kovell. Bostick's complaints were that Kovell (1) made a joke about a client; (2) refused to administer a drug test to a client with HIV; (3) referred to a client in a phone call, thereby implicating confidentiality concerns; (4) refused to take a dinner to a client; and (5) allowed a client to take food to her room.

{¶ 31} A couple of days later, Grabowski held a meeting with Bostick and Kovell to discuss their complaints about each other. Bostick secretly recorded the meeting. Bostick was confrontational throughout the meeting, threatened to leave the meeting several times, and eventually did walk out of the meeting.

{¶ 32} After Bostick left the meeting, Kovell told Grabowski that she (Kovell) had recorded the meeting. Kovell was suspended for recording the meeting and Bostick was suspended for her behavior during the meeting.

{¶ 33} On March 20, 2020, Grabowski sent an email to White, wherein she noted that: (1) Bostick's "demeanor is confrontational and uncooperative"; (2) Bostick was "hostile" during Grabowski's latest meeting with her; (3) Bostick "has had difficulty getting along with several co-workers"; and (4) Bostick "has difficulty accepting redirection." Grabowski wrote that Bostick was "not a good fit as an employee of the Salvation Army."

{¶ 34} That same day, March 20, 2020, White sent an email to the Salvation Army's human resources director for the Northeast Ohio Division requesting permission to terminate Bostick. The request was approved and a "termination of service form" was prepared and signed by White and the Harbor Light executive director. The reason for the termination as stated on the form was "continual discourtesy towards staff, repeated failure to get along." The form also noted that Bostick had previously been given a warning and suspension due to her inability to get along with coworkers. Bostick was terminated in late March 2020. The Salvation Army subsequently hired an African-American female for Bostick's position.

**Additional Relevant Evidence**

**Salvation Army Records Show that Bostick Applied for Only One Other Position at the Salvation Army; the Position was in the Corrections Program**

{¶ 35} As mentioned, when Bostick first began her employment with the Salvation Army, she was working with Jennifer Tresatti in the survivors' program. In September 2019, the Salvation Army posted an open position for a case manager at the shelter. According to the Salvation Army's records, three people, including Tresatti, applied for the job — Bostick was not one of the three applicants. At her deposition, Bostick admitted that during the time she was employed at the Salvation Army she only applied for one internal position.

{¶ 36} The director of the shelter, an African-American female, selected Tresatti for the case manager position. The record demonstrates that Tresatti has a

bachelor's degree in applied technology from Kent State University and a master's degree in human resources from Capella University.

{¶ 37} The day after Bostick was told that Tresatti received the position at the shelter (when Bostick was informed about her shift change), Bostick applied for an open position in the corrections program. An African-American male, with a bachelor's degree in criminal justice and prior work experience as a security guard, was selected for the position.

## Salvation Army's Demographics and General Discipline History

{¶ 38} According to data the Salvation Army was required to report to the U.S. Equal Opportunity Commission, from 2016 through 2020, approximately 70 percent of the employees at Harbor Light were African-American.

{¶ 39} The Salvation Army's disciplinary records show that from 2015 through 2020 six white employees were disciplined for offenses similar to Bostick's offenses. At her deposition, Bostick admitted that she does not have evidence that similarly situated employees who are not in her protected class were treated more favorably than her.

## Assignments of Error

    I.    The trial court erred in granting appellees' motion for summary judgment on Count I of appellant's complaint, race discrimination in violation of Ohio Revised Code Section 4112.01 Et Seq.

    II.    The trial court erred in granting appellees' motion for summary judgment on Count II of appellant's complaint, unlawful retaliation in violation of Ohio Revised Code Section 4112.02(I).

III. The trial court erred in granting appellee's motion for summary judgment on Count III of appellant's complaint, wrongful termination in violation of public policy.

IV. Summary judgment was inappropriate because questions of fact remain regarding appellees' pretextual reason for terminating Bostick's employment.

**Law and Analysis**

### Summary Judgment Standard of Review

{¶ 40} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, in viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 41} In a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate their entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

**Race Discrimination**

{¶ 42}    Bostick asserted a claim of racial discrimination in violation of the Ohio Civil Rights Act, R.C. 4112.01 et seq.  Under R.C. 4112.02(A), it is "an unlawful discriminatory practice" "[f]or any employer, because of the race, color * * * or ancestry of any person, to discharge without just cause * * * or otherwise to discriminate against that person with respect to * * * tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Because discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") are analogous to claims under the Ohio Civil Rights Act, we may look to federal cases interpreting Title VII to assist us in interpreting Ohio law.  *See, e.g.*, *Crable v. Nestle USA, Inc.*, 8th Dist. Cuyahoga No. 86746, 2006-Ohio-2887, ¶ 23, citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

{¶ 43}    A plaintiff may prove intentional race discrimination in employment (1) by direct evidence that a termination or other adverse employment decision was motivated by race; or (2) indirectly, by circumstantial evidence, using the burden-shifting method articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as adopted by the Ohio Supreme Court in *Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), and *Plumbers & Steamfitters Joint Apprenticeship Commt.* at 192, and as modified in *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, 803 N.E.2d 781.

{¶ 44} Bostick does not claim to have direct evidence of race discrimination. Rather, she contends that she presented circumstantial evidence demonstrating a prima facie case of race discrimination. In considering an alleged circumstantially evident case of race discrimination, we analyze the claim under a burden-shifting framework. *Smith v. ExpressJet Airlines, Inc.*, 8th Dist. Cuyahoga No. 101336, 2015-Ohio-313, ¶ 13. The plaintiff bears the initial burden to set forth a prima facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence showing a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.*, citing *Mosley v. Cuyahoga Cty. Bd. of Mental Retardation*, 8th Dist. Cuyahoga No. 96070, 2011-Ohio-3072, ¶ 64. If the employer articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the proffered reason was not the true reason for the adverse employment action. *Smith* at *id.*, citing *Mosley* at *id.*

{¶ 45} This court has recently held that the four-part test set forth in *Scovill* is the appropriate test for analyzing whether a plaintiff has met his or her burden of setting forth a prima facie case of race discrimination. *Williams v. PNC Bank, N.A.*, 8th Dist. Cuyahoga No. 111452, 2022-Ohio-4287, ¶ 57-58, 61. The following requirements for a plaintiff to establish a prima facie case of race discrimination under *Scovill* are that he or she was: (1) a member of a protected class; (2) discharged; (3) qualified for the position in question; and (4) replaced by, or his or her discharge permitted the retention of, a person who did not belong to the protected class. *Scovill* at 148.

{¶ 46} It is undisputed that Bostick, an African-American, is a member of a protected class, she was discharged from her position at the Salvation Army, and she was qualified for her position. At issue in this appeal is the final element of a prima facie race discrimination claim.

{¶ 47} Bostick contends that the Salvation Army "treated [her] less favorably than similarly situated Caucasian employees when they refused to consider [her] for a case manager position, and instead promoted Tresatti, a Caucasian." Bostick claims that she used the Salvation Army's online application process to apply for the case manager position. However, at her deposition, Bostick was unable to recount any details about what the position entailed.

{¶ 48} On the other hand, the Salvation Army contends that three people applied for the case manager position, and Bostick was not one of them. According to the Salvation Army, the only internal position Bostick applied for while working at the Salvation Army was for a position in the corrections program. Bostick contends that this discrepancy creates a material issue of fact and bars summary judgment being granted in favor of the Salvation Army. We disagree. Bostick admitted that she only applied for one internal position at the Salvation Army. The Salvation Army produced documentation that that one position was in the corrections program. The record simply does not support Bostick's contention that she applied for the case manager position at the shelter.

{¶ 49} Bostick further contends that even if the Salvation Army did not receive her application for the shelter case manager position, it knew she had an

interest in the position and, therefore, had a duty to consider her. According to Bostick, the Salvation Army's failure to consider her and hire a Caucasian female amounts to race discrimination. Other than Bostick's own assertion, the record is lacking evidence that she ever expressed an interest in the shelter case manager position. Neither Grabowski nor White recalled that Bostick ever expressed an interest in the position to them. Without corroboration, Bostick's assertion is merely self-serving. It is well established that unsupported, self-serving statements alone are insufficient to create an issue of fact. *See e.g., Davis v. Cleveland*, 8th Dist. Cuyahoga No. 83665, 2004-Ohio-6621, ¶ 23.

{¶ 50} We are also not persuaded by Bostick's reliance on *Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir.2000), in support of her contention that the Salvation Army had a duty to consider her even if it never received her application. *Dews* is distinguishable from this case. In *Dews*, the plaintiff, an African-American male, had an approximate 12-year career with the defendant company. During his tenure at the company, the plaintiff was promoted several times and retained his employment with the company through rounds of layoffs and eliminations of his positions.

{¶ 51} At one point, a district sales manager position became available and the plaintiff and another employee were considered for it. Ultimately, the company selected the other employee. Three years later, that employee left the company. Although the plaintiff had previously been a strong contender for the position, the company recruited from the outside to fill the position. Around the same time,

another sales manager position was filled by an entry-level employee who did not have management experience at the company.

{¶ 52}    Approximately one year later, yet another sales manager position for the company became available; it was for the company's Western Division. At the time, the plaintiff was living and working in Atlanta. He inquired about being considered for the position but was told the candidate had to live in the Western part of the country and there would be no relocation funds allocated for a move. The company hired an individual who, at the time selected, resided in Chicago. Shortly thereafter, the plaintiff voluntarily resigned from the company because he felt that he had exhausted all possible promotional opportunities there and he filed a race discrimination action against the company.

{¶ 53}    The district court granted summary judgment in favor of the company, finding that the plaintiff never applied for the sales manager positions. On appeal, the Sixth Circuit Court of Appeals disagreed with the trial court holding that

> [i]n failure to promote cases a plaintiff does not have to establish that he [or she] applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion. Instead, the company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known.

*Dew*, 231 F.3d at 1022.

{¶ 54}    The *Dew* Court reasoned that the "exception to the application requirement is significant because in many cases where discriminatory animus truly

is at issue, an employer may simply avoid advertising a particular opening so as to avoid controversy among affected employees." *Id.* Here, however, the Salvation Army advertised the shelter case manager position. There is no evidence, as there was in *Dew*, that the Salvation Army limited the position to external applicants or attempted to dissuade Bostick from applying. The circumstances in *Dew* are completely distinguishable from the circumstances here and not helpful to Bostick.

{¶ 55} Moreover, even if Bostick had applied for the shelter case manager position, Bostick has failed to demonstrate that she was more qualified than Tresatti for the position. According to Bostick's initial application with the Salvation Army, she has a high school diploma, was a state tested nurse's assistant, and was a phlebotomist. In contrast, Tresatti has both an undergraduate and graduate degree. Additionally, at the time the position for the shelter case manager was posted in the fall of 2019, Bostick had already had confrontations with Silver and Wentz and her problematic behavior had been documented. Indeed, Bostick's August 2019 performance review noted that she had difficulty getting along with coworkers.

{¶ 56} Furthermore, contrary to Bostick's contention, she was not replaced by someone outside of her protected class. Rather, the Salvation Army hired another African-American female for Bostick's position. The record also does not bear out Bostick's contention that she was treated differently from others not in her protected class. Bostick herself admitted that she has no evidence to support her contention, and the Salvation Army's records demonstrate that Bostick's contention is without merit. Between 2015 and 2020, the Salvation Army disciplined six Caucasian

employees, including Tresatti and Kovell, for infractions similar to the ones documented against Bostick.

{¶ 57} Bostick's claim that the Salvation Army terminated her in violation of its progressive discipline policy is also without merit. The discipline policy provided that "immediate discharge may result from any serious offense," including offenses such as "abusive behavior" and "insubordination." The policy further provided that disciplinary action "may range from a verbal warning, a written warning, a suspension without pay[,] to immediate discharge." The record demonstrates that Bostick was given two formal notices about her behavior — first, through her August 2019 performance review and second, through her January 2020 suspension. On this record, Bostick's contention that the Salvation Army failed to follow its disciplinary policy is without merit.

{¶ 58} Bostik has failed to demonstrate a prima facie case of race discrimination, thus, the burden does not shift to the Salvation Army to present a legitimate, nondiscriminatory reason for her termination. Nonetheless, the record demonstrates that the Salvation Army discharged Bostick for a legitimate, nondiscriminatory reason; that being, her continual inability to get along with her coworkers.

{¶ 59} Moreover, on the record before us, Bostick is unable to demonstrate that the reason for her discharge is pretextual. Under this third step, if the employer carries its burden, Bostick needs to demonstrate that the reason the Salvation Army offered for terminating her is actually a pretext for discrimination. *McDonnell*

*Douglas*, 411 U.S. at 807, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Plumbers & Steamfitters Joint Apprenticeship Commt.*, 66 Ohio St.2d at 198, 421 N.E.2d 128. To do so, Bostick must prove either "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge.'" *Sweet v. Abbott Foods, Inc.*, 10th Dist. Franklin No. 04AP-1145, 2005-Ohio-6880, ¶ 34, quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). "'Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination'" is an insufficient basis to establish pretext. *Olive v. Columbia/HCA Healthcare Corp.*, 8th Dist. Cuyahoga No. 75249, 2000 Ohio App. LEXIS 914, 25 (Mar. 9, 2000), quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

{¶ 60}     The burden on Bostick under this third step "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Thus, to establish that a proffered reason is pretext for discrimination, the plaintiff must show "both that the reason was false, *and* that discrimination was the real reason." (Emphasis sic.) *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Boyd v. Ohio Dept. of Mental Health*, 10th Dist. Franklin No. 10AP-906, 2011-Ohio-3596, ¶ 28. Thus, "if an employer honestly believes in the legitimate, nondiscriminatory reason that it relied on in making its employment decision, then the employer lacks the necessary discriminatory intent." *Smith v. Ohio Dept. of Pub. Safety*, 2013-

Ohio-4210, 997 N.E.2d 597, ¶ 78 (10th Dist.), citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998). In order for an employer to claim an honest belief in its proffered reason, the employer must establish its reasonable reliance on particularized facts that were before it at the time it made the adverse employment decision. *Smith* at *id.*

{¶ 61}     According to Bostick, the Salvation Army did not have plans to fire her before the March 19, 2020 meeting with Grabowski and Kovell, but once she complained that African-Americans were disciplined "more than Caucasians and that she intended to retain an attorney due to the discrimination she suffered," she was fired.

{¶ 62}     Bostick further contends that although she was civil at the meeting, and Kovell was "rude and disruptive," she (Bostick) was the one who got fired. The transcript of the meeting does not paint a picture supportive to Bostick's claim. Rather, Bostick was loud and was told numerous times to lower her voice, she talked over Kovell, repeatedly insulting her, and threatened to leave the meeting several times before she ultimately did walk out.

{¶ 63}     Further, Bostick's behavior at the meeting was not an isolated incident. Rather, over the course of Bostick's 11-month employment at the Salvation Army she had been involved in numerous negative incidents. The incidents resulted in an admonishment in her performance review and a written warning. The record demonstrates that Bostick did not get along with her coworkers — a prerequisite to

any job — and that was the reason for her discharge.  Thus, she failed to show that her discharge was pretextual.

{¶ 64}        Accordingly, summary judgment in favor of the Salvation Army was properly granted.

{¶ 65}        As relates to Grabowski, Grabowski filed her own motion for summary judgment that incorporated the same arguments as the Salvation Army, but also included separate arguments about superior liability.

{¶ 66}        A supervisor or a manager may be held jointly and severally liable with his or her employer for the supervisor or manager's discriminatory conduct. *Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293, 300, 703 N.E.2d 782 (1999), *now superseded by statute.*[2]  Bostick contends that Grabowski "acted in the interest of the Salvation Army" and therefore is liable for its discriminatory conduct. However, because we have determined that the Salvation Army's actions in the case were not discriminatory, Bostick's claim against Grabowski necessarily fails.

---

[2] We note that on January 12, 2021, the Ohio legislature passed a law to supersede *Genaro* and declared its intent that individual supervisors, managers, or employees generally cannot be held liable under R.C. Chapter 4112.  *See* H.B. 352, Section 3. However, that law did not take effect until April 15, 2021, and at least two federal courts have concluded that the amendment does not have retroactive effect.  *See Williams v. Barton Malow Co.*, 581 F.Supp.3d 923 (N.D.Ohio 2022); *Whitman v. Internatl. Paper Co.*, N.D. Ohio No. 5:20-CV-02781, 2021 U.S. Dist. LEXIS 116684 (June 23, 2021). (Bostick filed her complaint on April 5, 2021).

Relevant to this case, H.B. 352 eliminated supervisor liability for some employment discrimination claims by redefining the term employer. The term employer previously included "any person acting directly or indirectly in the interest of an employer." *See* former R.C. 4112.01(A)(2).  The legislature eliminated that language and declared its intent that "individual supervisors, managers, or employees not be held liable" for certain unlawful employment practices under R.C. 4112.02, including race discrimination.  *See* H.B. 352 at Section 3.

{¶ 67} Accordingly, the first assignment of error is overruled.

**Retaliation**

{¶ 68} Bostick also asserted a claim against the Salvation Army and Grabowski for retaliation. She claims that in December 2019, she complained that she was being treated in a discriminatory manner by not being considered for the shelter position, and thereafter, suffered "repeated reprimands" and ultimately termination. Bostick further claims that she complained in March 2020, that Caucasian employees were not disciplined at the rate or to the severity that African-American employees were, and after voicing her complaint and stating that she intended to get an attorney, she was terminated.

{¶ 69} To establish a prima facie claim of retaliation under R.C. 4112.02(I), a plaintiff has to show that (1) he or she engaged in a protected activity; (2) his or her employer knew of his participation in the protected activity; (3) he or she suffered an adverse employment action; and (4) a causal link existed between the protected activity and the adverse action. *Wille v. Hunkar Laboratories, Inc.*, 132 Ohio App.3d 92, 107-108, 724 N.E.2d 492 (1st Dist.1998). The same burden-shifting process previously discussed applies to retaliation claims. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668.

{¶ 70} Bostick's claim that the Salvation Army retaliated against her for complaining about not getting the position at the shelter is without merit. The record demonstrates that she neither applied for the position nor complained about not getting it. Her only complaint relative to the shelter position was that, because

Tresatti was leaving the program where they both worked, Bostick was told that her shift would change.

{¶ 71} We likewise find no merit to Bostick's claim that the Salvation Army retaliated against her for stating she was getting an attorney because of the disparate disciplinary treatment between African-American employees and Caucasian employees. Initially, we note that it has been held that there is "no question that it is against the clear public policy of the state of Ohio for an employer to terminate an employee for retaining legal counsel." *Kulick v. Ethicon Endo-Surgery, Inc.*, 803 F.Supp.2d 781, 788-789 (S.D.Ohio 2011). But Bostick's contention that she stated she was going to retain counsel because of alleged disparate treatment is not reflected in the record. At the March 2020 meeting, Bostick did complain about what she perceived to be disparate treatment, but her comment about getting an attorney was not made in conjunction with that complaint. Rather, Bostick stated that she was getting an attorney when she was informed that she was being suspended for her conduct at the meeting.

{¶ 72} Nonetheless, the record does not support Bostick's contention that her reference to obtaining counsel was the reason for her termination. Rather, the record is rife with examples of Bostick's inability to get along with her coworkers, which is the reason she was terminated.

{¶ 73} As the retaliation claim relates to Grabowski, we note that H.B. 352 does not extend to retaliation claims. *See* R.C. 4111.02(I) (prohibiting "*any person*" from discriminating "in any manner against any other person because that person

has opposed any unlawful discriminatory practice defined in this section * * *.")
(Emphasis added.); *Williams*, 581 F.Supp.3d at 927 (The change under S.B. 352
"does not apply to [R.C.] 4112.02(I), claims for retaliation, or [R.C.] 4112.02(J),
claims for aiding and abetting retaliation.").

{¶ 74}     At her deposition, Bostwick was unable to cite specific examples of
instances where Grabowski subjected her to undue criticism.  Bostick testified,
"[i]t could be anything. I don't remember. I have no idea. It could just be anything."
Although Bostick referenced text messages in which Grabowski allegedly unduly
criticized her, the messages were never produced.

{¶ 75}     On this record, Bostwick failed to demonstrate that she was
terminated in retaliation for any protected activity she engaged in.  The second
assignment of error is overruled.

**Wrongful Discharge**

{¶ 76}     In her third assignment of error, Bostick contends that the trial court
erred in granting summary judgment in favor of the Salvation Army on her wrongful
discharge claim.  We disagree.

{¶ 77}     To assert a tort claim for wrongful discharge in violation of public
policy, a plaintiff must establish each of the following four elements:

> "1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element)."

*Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 677 N.E.2d 308 (1997), quoting Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U.Cin.L.Rev. 397, 398-399 (1989).

{¶ 78}     In support of her claim, Bostick contends that in February 2020 she complained about the way Kovell interacted with clients in the survivors' program and she provided "written complaints prepared by Harbor Light residents detailing" Kovell's conduct to the Salvation Army.  Bostik further contends that there are clear public policies protecting individuals who suffer from "addiction," and prohibiting the "abuse of residential clients."  Additionally, according to Bostick, after she complained about Kovell, Kovell filed retaliatory complaints against her, and they met in March 2020 to address their issues.  Bostick asserts that at the meeting, Kovell was unruly and combative, which led to Grabowski having to end the meeting.

{¶ 79}     The record belies Bostick's contentions.  The record shows that on March 12, 2020, Kovell verbally complained to Grabowski about Bostick and Grabowski told Kovell to put her complaints in writing.  The following day, March 13, Kovell submitted five written complaints against Bostick.  On March 17, 2020, Grabowski told Bostick that Kovell had submitted five written complaints about her and that same day, Bostick submitted five written complaints about Kovell.  A

meeting was held on March 19 to address the issues between Bostick and Kovell. Throughout the meeting, Bostick was insulting, threatened to leave the meeting, and eventually did walk out of the meeting.

{¶ 80} There simply is no evidence that Bostick complained about Kovell in February 2020. Rather, the evidence shows that it was Kovell who complained about Bostick verbally on March 12, 2020, and in writing on March 13, 2020. It was Bostick who, after learning about Kovell's complaints, filed five complaints against Kovell on March 17, 2020. This record does not demonstrate that Bostick complained about Kovell to enforce any public policy.

{¶ 81} We are not persuaded by Bostick's citation to R.C. Chapters 5119 and 5122 for the proposition that there is a public policy of protecting clients in programs for victims of human trafficking. R.C. Chapter 5119 governs the "Department of Mental Health" and addresses issues relevant to those who suffer from various types of addictions. There is no mention in that Chapter to anything having to do human trafficking.

{¶ 82} R.C. Chapter 5122 relates to the "Hospitalization of Mentally Ill." R.C. 5122.011 states that the Chapter applies to those who are found incompetent to stand trial or who are found not guilty by reason of insanity and hospitalized. Thus, this Chapter also does not apply to programs for the survivors of human trafficking and there is no mention of such programs in the Chapter.

{¶ 83} The record before us demonstrates that Bostick has failed to establish any of the four elements of a wrongful discharge in violation of public policy claim.

Rather, the record demonstrates that the Salvation Army discharged her because of her continual inability to get along her coworkers.

{¶ 84} The third assignment of error is overruled.

**Pretext**

{¶ 85} Finally, Bostick has assigned pretext as a separate assignment of error, wherein she claims that summary judgment was inappropriate because there are genuine issues of material fact regarding whether the Salvation Army's reason for her termination was pretextual. In regard to all Bostick's claims — race discrimination, retaliatory discharge, and wrongful termination — for the reasons already discussed, we find no issue regarding pretext. In the short time Bostick was employed at the Salvation Army, she continually had confrontations with various employees. She was advised twice — once in her performance review and the other time in her written warning — that she needed to do better. When she did not, the Salvation Army discharged her. We find no pretext on this record.

{¶ 86} The fourth assignment of error is overruled.

{¶ 87} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MICHAEL JOHN RYAN, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN A. GALLAGHER, J., CONCUR